**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL ORGANIZATION FOR WOMEN-NEW YORK CITY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, and UNITED STATES DEPARTMENT OF VETERANS AFFAIRS,<br><br>Defendants. | 23 Civ. 6750 (VEC) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

I. Statutory and Regulatory Background ..... 3

A. DoD's IVF Benefits for Active-Duty Service Members ..... 3

B. VA's IVF Benefits for Veterans under VHA ..... 7

II. Factual Background ..... 9

STANDARD OF REVIEW ..... 10

ARGUMENT ..... 11

I. Plaintiff Lacks Standing ..... 11

A. Plaintiff Lacks Organizational Standing ..... 11

B. Plaintiff Lacks Associational Standing to Challenge DoD's SCD Condition Because It Has Not Identified Any Member Whose Rights It Seeks to Vindicate ..... 12

II. The VJRA Divests the Court of Jurisdiction Over Plaintiff's Claims Against VA ..... 14

III. Plaintiff Fails to State a Substantive Due Process Claim Against the Agencies' SCD Conditions ..... 16

IV. Plaintiff Fails to State an Equal Protection Claim Against the SCD Conditions ..... 21

V. Plaintiff Fails to State a Section 1557 Claim Against the SCD Conditions ..... 23

VI. Plaintiff Fails to State an APA Arbitrary and Capricious Claim Against DoD's SCD Condition ..... 25

CONCLUSION ..... 26

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 11, 23

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*,
968 F.2d 196 (2d Cir. 1992) .......... 10, 11

*Biediger v. Quinnipiac Univ.*,
691 F.3d 85 (2d Cir. 2012) .......... 24

*Bon v. United States*,
802 F.2d 1092 (9th Cir. 1986) .......... 14

*Brass v. Am. Film Tech., Inc.*,
987 F.2d 142 (2d Cir. 1993) .......... 11

*Califano v. Boles*,
443 U.S. 282 (1979) .......... 22

*Catskill Mountains Chapter of Trout Unlimited v. EPA*,
846 F.3d 492 (2d Cir. 2017) .......... 25

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) .......... 14

*Cnty. of Rockland v. U.S. Nuclear Regul. Comm'n*,
709 F.2d 766 (2d Cir. 1983) .......... 25

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) .......... 11, 12

*Cubias v. United States*,
No. 5:19-CV-46-FL, 2019 WL 4621981 (E.D.N.C. Sept. 23, 2019) .......... 14

*Dark Storm Indus. LLC v. Cuomo*,
471 F. Supp. 3d 482 (N.D.N.Y. 2020) .......... 4

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) .......... 11

*Disabled Am. Veterans v. U.S. Dep't of Veterans Affs.*,
962 F.2d 136 (2d Cir. 1992) .......... 15

*Do No Harm v. Pfizer Inc.*,
No. 23-15, 2024 WL 949506 (2d Cir. Mar. 6, 2024) .......... 12

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .......... 17, 18, 21

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 25

*Harris v. McRae*,
448 U.S. 297 (1980) .......... 17

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 12

*Heckler v. Ringer*,
466 U.S. 602 (1984) .......... 16

*Heller v. Doe by Doe*,
509 U.S. 312 (1993) .......... 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 11

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998) .......... 11, 12

*Jones v. Derwinski*,
968 F.2d 1497 (2d Cir. 1992) .......... 14, 15

*Judulang v. Holder*,
565 U.S. 42 (2011) .......... 25

*Leger v. Kalitta*,
No. 16-CV-6545, 2018 WL 2057142 (E.D.N.Y. Jan. 26, 2018) .......... 4, 5, 6

*Matthew v. United States*,
311 Fed. App'x 409 (2d Cir. 2009) .......... 14

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) .......... 17, 23, 24, 25

*Pen Am. Ctr., Inc. v. Trump*,
448 F. Supp. 3d 309 (S.D.N.Y. 2020) .......... 13

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) .......... 22, 23

*Qualls v. Rumsfeld*,
228 F.R.D. 8 (D.D.C. 2005) .......... 13

*Rynasko v. N.Y. Univ.*,
63 F.4th 186 (2d Cir. 2023) .......... 18

*Schweiker v. Wilson*,
450 U.S. 221 (1981) .......... 18, 21

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) .......... 12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 11

*Sugrue v. Derwinski*,
26 F.3d 8 (2d Cir. 1994) .......... 15

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 13

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
752 F.3d 239 (2d Cir. 2014) .......... 10

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) .......... 11

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
523 F. Supp. 2d 328 (S.D.N.Y. 2007) .......... 16

*United States v. Brown*,
45 M.J. 389 (C.A.A.F. 1996) .......... 13

*United States v. Moore*,
54 F.3d 92 (2d Cir. 1995) .......... 23

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988) .......... 24

*Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*,
323 F. Supp. 3d 501 (S.D.N.Y. 2018), *recons. denied sub nom. Weinreb v. Xerox Bus. Servs.*, No. 16-CV-6823 (JGK), 2020 WL 4288376 (S.D.N.Y. July 27, 2020) .......... 23, 24

*Xiaolu Peter Yu v. Vassar Coll.*,
97 F. Supp. 3d 448 (S.D.N.Y. 2015) .......... 24

**STATUTES**

5 U.S.C. § 706 .......... 16

10 U.S.C. § 888 .......... 13

10 U.S.C. § 933 .......... 13

10 U.S.C. § 934 .......... 13

10 U.S.C. § 1072 .......... 3

10 U.S.C. § 1073d .......... 21

10 U.S.C. §1074 .......... *passim*

10 U.S.C. § 1075a .......... 21

10 U.S.C. § 1079 .......... 4, 19, 25, 26

38 U.S.C. § 502 .......... 16

38 U.S.C. § 511 .......... 14

38 U.S.C. § 1710 .......... 21

38 U.S.C. § 1712 .......... 19

38 U.S.C. § 1728 .......... 19

38 U.S.C. § 7105 .......... 14

38 U.S.C. § 7252 .......... 14

38 U.S.C. § 7292 .......... 14, 15

42 U.S.C. § 18116 .......... 23

Consolidated Appropriations Act, 2023,
Pub. L. No. 117-328, 136 Stat. 4459 (2023) .......... 7

Continuing Appropriations and Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2017, Pub. L. No. 114-223, 130 Stat. 857 (2017) .......... 7

N.Y. Ins. L. § 3221 .......... 20

N.Y. Ins. L. § 4303 .......... 20

**RULES**

Fed. R. Civ. P. 12 .......... 1, 10, 11

**REGULATIONS**

5 C.F.R. § 890.203 .......... 21

5 C.F.R. § 890.502 .......... 21

32 C.F.R. § 199.1 .......... 21

32 C.F.R. § 199.4 .......... 26

32 C.F.R. § 199.17 .......... 21

38 C.F.R. § 17.36 .......... 21

38 C.F.R. § 17.38 .......... 21

38 C.F.R. § 17.380 .......... 1, 8

Civilian Health and Medical Program of the Uniformed Services,
42 Fed. Reg. 17,972 (April 4, 1977) .......... 26

Civilian Health and Medical Program of the Uniformed Services,
51 Fed. Reg. 24,008 (July 1, 1986) .......... 26

Fertility Counseling and Treatment for Certain Veterans and Spouses,
84 Fed. Reg. 8254 (March 7, 2019) .......... 8

Fertility Counseling and Treatment for Certain Veterans and Spouses,
82 Fed. Reg. 6273 (Jan. 19, 2017) .......... 8

**OTHER AUTHORITIES**

159 Cong. Rec. S3611 (May 20, 2013) .......... 18

Benefits.gov, *Basic Medical Benefits Package for Veterans*,
https://perma.cc/86CW-NJ3Q .......... 21

DoD Directive 1300.24,
https://perma.cc/49AG-2N76 .......... 4

Health.mil, TRICARE Operations Manual (Apr. 1, 2015),
https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-05-24/ChangeOnly/TO15/c17s3.html .......... 19

Jodie Katon et al., *Self-Reported Infertility Among Male and Female Veterans Serving During Operation Enduring Freedom/Operation Iraqi Freedom*,
23 J. Women's Health 175 (2013) .......... 22

*Manual for Courts-Martial*, United States (2024 ed.) .......... 13

Reproductive Biology and Endocrinology Journal, National Institute of Health, National Library of Medicine (Aug. 4, 2022), https://perma.cc/DC8N-EVPX .......... 18

VA, *Eligibility for community care outside VA*,
https://perma.cc/ZTN8-YAHN ........................................................................................ 21

VA.gov, *VA Expands In Vitro Fertilization for Veterans*,
https://perma.cc/SHG3-UG4K......................................................................................... 9

Defendants U.S. Department of Defense and U.S. Department of Veterans Affairs respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and their motion to dismiss in part pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff's Amended Complaint challenges several eligibility conditions for in vitro fertilization ("IVF") benefits provided by the U.S. Department of Defense ("DoD") and U.S. Department of Veterans Affairs ("VA") (together, "Defendants" or the "Agencies"). DoD recently removed most of those conditions, and VA determined that it will soon follow suit. The Agencies' amended IVF policies will retain, as relevant here, a requirement that the IVF care be needed due to a disability (an injury or illness) incurred in the line of duty. Plaintiff National Organization for Women–New York City ("NOW-NYC"), however, suggests that *no* conditions on IVF eligibility are permissible. Plaintiff's position is legally unfounded, and the Agencies acted within their limited authority in retaining reasonable conditions on costly IVF benefits. For these reasons and others, the Court should dismiss Plaintiff's claims concerning the service-connected disability conditions ("SCD Conditions").[1]

*First*, Plaintiff lacks standing to pursue its challenges to the Agencies' IVF policies. Plaintiff cannot establish organizational standing because it fails to plead any direct, involuntary injury that it is suffering as a result of the Agencies' policies. Plaintiff also fails to establish

[1] As explained *infra*, DoD's and VA's requirements for satisfying this service-connected requirement are phrased differently. *Compare* 38 C.F.R. § 17.380(a)(1) (requiring "a service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment"), *and* Am. Compl. Ex. D (ECF No. 40-2) at 3, § 234(b)(2) (requiring same in statute authorizing funds for VA IVF benefits), *with* Am. Compl. Ex. A, § III.A (requiring a "serious or severe illness/injury while on active duty that led to the loss of [the service member's] natural procreative ability"). Those differences are irrelevant to the issues raised in this motion, and for ease of reference, the requirements are collectively referred to as the SCD Conditions throughout this brief.

associational standing to challenge DoD's SCD Condition because it has not identified any member, by name, with standing to challenge DoD's IVF Policy. Plaintiff is not relieved of this Article III requirement based on an unsupported assertion that named members would suffer retaliation.

*Second*, the Veterans Judicial Review Act ("VJRA") divests this Court of jurisdiction over the claims against VA. The VJRA sets forth an exclusive scheme through which a party must assert any challenge to an adverse benefits determination. Regardless of how Plaintiff frames its challenge, this action in fact challenges a benefits determination: Plaintiff claims that VA has improperly denied, and will continue to deny, IVF benefits to certain persons. Accordingly, the Court should not allow Plaintiff to sidestep the exclusive VJRA review scheme.

*Third*, Plaintiff's claims against the SCD Conditions fail on the merits. Its substantive due process claim fails because a fundamental right to procreate does not include an affirmative duty by the government to provide benefits to facilitate procreation. The SCD Conditions thus need only survive the deferential rational basis test, which they do: Congress could have reasonably determined that funding for certain extended health benefits, including IVF, should be allocated to remedy service-related injuries and illnesses that render service members and veterans unable to procreate. Plaintiff's equal protection claim—that the SCD Conditions disproportionately impact women and LGBTQ+ individuals—lacks merit as well. For one, Plaintiff fails to adequately plead that there is any meaningful disproportionate impact. People of all genders and sexual orientations use IVF due to infertility, and the SCD Conditions apply equally to all of them. Additionally, even if Plaintiff could establish a disproportionate impact, it does not sufficiently plead—as it must—that in imposing the SCD Conditions, the Agencies acted with an *intent* to discriminate. The SCD Conditions have an obvious, non-discriminatory justification, and women and LGBTQ+

individuals can satisfy the SCD Conditions, which undermines any inference of improper motive. The equal protection claim thus fails.

Finally, Plaintiff's statutory claims fare no better. Plaintiff alleges that the SCD Conditions violate Section 1557 of the Affordable Care Act ("ACA")—which bars sex-based discrimination in certain health programs—because they disproportionately impact women and LGBTQ+ individuals. This Court recently concluded, however, that a party cannot allege sex discrimination under section 1557 through a disparate impact theory. In any event, Plaintiff fails to establish a material, disproportionate impact. Plaintiff's arbitrary-and-capricious claim under the Administrative Procedure Act ("APA") against DoD's SCD Condition also fails because DoD was obligated to adopt that condition under the authorizing statute, and a standard arbitrary-and-capricious claim applies only when an agency adopts a policy as an exercise of discretion. Regardless, a policy survives the deferential arbitrary-and-capricious standard if it is rational, which DoD's SCD Condition is.

The Court should therefore grant Defendants' Motion and dismiss all claims for lack of jurisdiction, or, in the alternative, the claims against the SCD Conditions for failure to state a claim.

## BACKGROUND

### I. Statutory and Regulatory Background

Active-duty service members ("ADSMs") are ordinarily eligible for health care benefits through the TRICARE program, which is administered by DoD. ECF No. 40 ("Am. Compl.") ¶ 28; 10 U.S.C. § 1072(7). Qualified veterans are generally eligible for health care benefits through the Veterans Health Administration ("VHA"), which is administered by VA. Am. Compl. ¶ 28.

#### A. DoD's IVF Benefits for Active-Duty Service Members

DoD may provide to ADSMs two principal types of benefits for health services. First, DoD may generally provide benefits for health services necessary to prevent, diagnose, or treat an

underlying medical condition. *See* 10 U.S.C. § 1074(c)(1)-(2) ("[f]unds appropriated to a military department . . . may be used to" cover "medical . . . care . . . in private facilities for members of the uniformed services" for care "comparable to" the care covered under "TRICARE Prime"); *id.* § 1079(a)(12) (private sector component of TRICARE Prime covers only services that are "medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction"). Second, DoD, through a separate statutory provision, may provide certain "extended benefits" for private health services that do not *treat* an underlying condition, but nonetheless "reduc[e] . . . the disabling effects of" a condition. *Id.* § 1079(d)(1) (authorizing "extended benefits for eligible dependents"); *see id.* § 1074(c)(4)(A) (authorizing DoD to provide ADSMs "coverage comparable to" the extended benefits provided to eligible dependents under §1079(d), (e)). DoD, however, may provide these extended benefits only to ADSMs who have suffered "a serious injury or illness" while "on active duty." *Id.* § 1074(c)(4)(A).

Section 1074 directs the Secretary of Defense to issue regulations setting forth a "definition of serious injury or illness." *Id.* § 1074(c)(4)(B)(ii). The Secretary accordingly issued a directive defining the phrase to include Category II and Category III conditions.[2] DoD Directive 1300.24 at 14 (Encl. 4) (2009). Category II is "a serious injury or illness" where the service member is "unlikely to return to duty within a time specified by his or her Military Department" and "[m]ay be medically separated from the military." *Id.* Category III is "a severe or catastrophic injury or illness" where the service member is "highly unlikely to return to duty" and "[w]ill most likely be medically separated from the military." *Id.*

[2] The Court may take judicial notice of DoD Directive 1300.24, which is available at https://perma.cc/49AG-2N76, for the document is as an official government record retrieved from a government website. *See, e.g.*, *Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 490 n.2 (N.D.N.Y. 2020) (citing *Leger v. Kalitta*, No. 16-CV-6545, 2018 WL 2057142, at *3 (E.D.N.Y. Jan. 26, 2018)).

Relying on DoD's extended benefits authority, the Secretary of Defense directed the provision of IVF benefits in an April 27, 2010, "Policy for Provision of In Vitro Fertilization Services for the Benefit of Seriously Injured Service Members." Ex. 1 (hereinafter "2010 DoD Memo"). That memorandum recognized that the two extended-benefits statutory provisions—Section 1074(c) and its incorporation by reference of Section 1079(d), (e)—provided new authority to offer IVF benefits, which did not previously exist under the TRICARE program:

> The Department is committed to ensuring the maximum support for our members who have become seriously injured as a result of their service on Active Duty. Although many medical and other benefits are available to these members and their families, members with spinal and other injuries that make it impossible to conceive a child naturally are not provided TRICARE coverage, which can assist them in becoming a parent. Under [Sections 1074(c) and 1079(d), (e)], Active Duty Service members receive a wide variety of services that are not covered under the TRICARE basic program and include benefits similar to those provided under [Section 1079(d), (e)] who have a serious physical disability or an extraordinary physical or psychological condition.

2010 DoD Memo at 1.

DoD then implemented its IVF policy in an April 3, 2012, "Implementing Guidance Memorandum" titled "Policy for Assisted Reproductive Services for the Benefit of Seriously or Severely Ill/Injured (Category II or III) Active Duty Service Members." Am. Compl. ¶ 32; *id*. Ex. A at 1, § III.B, ECF No. 40-2 (hereinafter "2012 DoD Memo"). The 2012 DoD Memo laid out the IVF benefits available to ADSMs and the eligibility requirements for coverage. *See id.* at 1-4, §§ III, IV.

Under the 2012 DoD Memo, IVF benefits were available "to service members, regardless of gender, who have sustained serious or severe illness/injury," *i.e.*, a Category II or III illness, "while on active duty that led to the loss of their natural procreative ability." *Id.* at 1, §§ II, III.A; *see also id.* § III.B ("The policy provides for the provision of assisted reproductive technologies to assist in the reduction of the disabling effects of the member's qualifying condition"). The

"[b]enefit . . . appl[ied] equally to male and female seriously or severely injured service members . . . ." *Id.* at 2, § III.D. Under the 2012 DoD Memo, the IVF "benefit [was] designed to allow the member and spouse to become biological parents through reproductive technologies where the Active Duty injury or illness ha[d] made it impossible to conceive naturally." *Id.* § III.E. As such, benefits provided were "limited to permitting a qualified member to procreate with his or her lawful spouse," and "[t]hird party donations and surrogacy [were] not covered benefits." *Id.* §§ III.C, III.E.

Following a review of its IVF policy, in December 2023, DoD determined that it would amend the 2012 DoD Memo to remove the categorical eligibility bar on those who are unmarried or require donor (*i.e.*, a non-spouse, third-party's) gametes. ECF No. 28 at 2. That amended policy, dated March 8, 2024, "applies to all qualifying Service members, regardless of gender or marital status." ECF No. 49-1 at 2, § III.A (hereinafter "Amended 2012 DoD Memo"). It permits "[u]se of donated third-party gametes or embryos . . . when provided at the qualifying Service member's expense." *Id.* at 3, § III.C. It also covers certain IVF services that are "rendered to a qualifying Service member's lawful spouse, unmarried partner, or a third-party gestational carrier" where such person is covered by TRICARE. *Id.* § III.D.

Consistent with DoD's statutory authorization and "commit[ment] to ensuring the maximum support for [service] members who have become seriously ill or injured as a result of their service on Active Duty, resulting in injuries or conditions that lead to the inability of those members to procreate without the use of ART," the Amended 2012 DoD Memo retains the service-connected disability requirement, *id.* at 1; *see id.* at 2, 5, §§ III.B, V. Specifically, it "continues to authorize benefits for such members to assist in the reduction of the disabling effects of a qualifying condition," *id.* at 1, *i.e.*, a Category II or III injury or illness, *id.* at 5, § V. "There is no

requirement for the qualifying Service member to demonstrate that they have tried, or intend to try, to procreate with a member of the opposite sex to establish that there has been a loss of their ability to procreate without the use of ART." *Id.* at 2, § III.A.

**B. VA's IVF Benefits for Veterans under VHA**

In 2017, the Continuing Appropriations and Military Construction, Veterans Affairs, and Related Agencies Appropriations Act authorized VA to use appropriated medical services funds to provide, for the first time, IVF services to certain veterans. Am. Compl. ¶ 41 (citing Pub. L. No. 114-223, § 260, 130 Stat. 857, 897 (2017)). That authorization has been regularly renewed by Congress, including in the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. J, Tit. II, § 234, 136 Stat. 4459 (2023) ("VA Appropriations Act" or "Section 234"). Am. Compl ¶ 47; *id.* Ex. D, ECF No. 40-5.[3]

The VA Appropriations Act, as in earlier years, provides that funds appropriated to VA "may be used to provide . . . fertility counseling and treatment using assisted reproductive technology to a covered veteran or the spouse of a covered veteran." *Id*. Ex. D at 2, § 234(a). The statute further defines a "covered veteran" to mean "a veteran . . . who has a service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment." *Id*. at 3, § 234(b)(2). Additionally, "assisted reproductive technology" ("ART") is defined in the Act as

> benefits relating to reproductive assistance provided to a member of the Armed Forces who incurs a serious injury or illness on active duty pursuant to [10 U.S.C. §1074(c)(4)(A)], as described in the memorandum . . . "Policy for Assisted Reproductive Services for the Benefit of Seriously or Severely Ill/Injured (Category II or III) Active Duty Service Members" issued by the Assistant Secretary of Defense for Health Affairs on April 3, 2012 [*i.e.* the 2012 DoD Memo], and the

[3] Congress recently renewed that authorization in the Consolidated Appropriations Act, 2024, Division A, Title II, Section 234. The relevant language in the 2024 authorization remains unchanged from the version cited in Plaintiff's Amended Complaint.

> guidance issued to implement such policy, including any limitations on the amount of such benefits available to such a member.

*Id*. § 234(b)(3).

After Congress authorized VA to cover certain IVF services, VA promulgated an Interim Final Rule, 82 Fed. Reg. 6273 (Jan. 19, 2017), which was finalized on March 7, 2019, 84 Fed. Reg. 8254; 38 C.F.R. § 17.380. Am. Compl. ¶ 42. Under the VA regulation, IVF benefits may be provided when clinically appropriate to a "veteran who has a service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment" and their spouse. 38 C.F.R. § 17.380(a)(1)(i). "[S]ervice-connected disability" is further defined to mean "for a male veteran, a service-connected injury or illness that prevents the successful delivery of sperm to an egg; and, for a female veteran with ovarian function and a patent uterine cavity, a service-connected injury or illness that prevents the egg from being successfully fertilized by sperm." *Id.* § 17.380(a)(2). Moreover, the VA regulation provides that IVF treatment will be provided when clinically appropriate "to the same extent such treatment is provided to a member of the Armed Forces who incurs a serious injury or illness on active duty pursuant to 10 U.S.C. § 1074(c)(4)(A), as described in the [2012 DoD Memo]" and DoD implementing guidance. *Id.* § 17.380(a)(3).

VHA Directive 1334, "In Vitro Fertilization Counseling and Services Available to Certain Eligible Veterans and Their Spouses," dated March 12, 2021, memorializes VA's policy for the provision of IVF services to eligible veterans and their spouses. Am. Compl. Ex. C at 1, ECF No. 40-4. It recognizes that "[S]ection 234(b)(3) defines 'assisted reproductive technology' as: assistance provided to a member of the Armed Forces who incurs a serious injury or illness . . . , as described in the [2012 DoD Memo]." *Id.* § 1.b. Because "the benefit is designed to allow the member and spouse to become biological parents through reproductive technologies where the

Active Duty injury or illness has made it impossible to conceive naturally," *id.* at 3, § 2.g (citing 2012 DoD Memo), VA Directive 1334 "bars the use of donated sperm, oocytes, or embryos, or gestational surrogacy," *id*. § 2.h.

VA determined in January 2024 that it would "make changes to its IVF policy to align the coverage it provides with that available under the forthcoming amended DoD IVF policy." ECF No. 33 at 2. Following the release of the Amended 2012 DoD Memo, VA announced on March 11, 2024, that it "will offer IVF benefits to qualifying Veterans regardless of marital status and . . . allow the use of donor eggs, sperm, and embryos." VA.gov, *VA Expands In Vitro Fertilization for Veterans*, https://perma.cc/SHG3-UG4K. VA expects these changes to be implemented "in the coming weeks." *Id.*

## II. Factual Background

Plaintiff NOW-NYC is a membership organization whose stated "mission is to ignite change for the women and girls of New York by advancing laws and powering activism." Am. Compl. ¶ 13. Plaintiff filed this suit on August 2, 2023, against DoD and VA, ECF No. 1, and amended its Complaint on February 9, 2024, ECF No. 40, following Defendants' motion to dismiss, ECF No. 35. Plaintiff challenges the Agencies' IVF policies insofar as they require that "Service members and veterans seeking coverage of IVF treatments must" (1) "together with a spouse, be able to provide their own sperm and eggs and are prohibited from using gametes from third parties," Am. Compl. ¶ 6 ("Gametes Condition"); (2) be "lawfully married," *id.* ("Marriage Condition"); and (3) have "an infertility diagnosis, . . . along with a determination that their infertility was directly caused by their service," *id.* ¶ 7 ("Infertility Causation Condition"), (collectively, the "Eligibility Conditions"). As to this Infertility Causation Condition, Plaintiff's claim has two parts: first, that both Agencies "define infertility based on lost ability to reproduce

coitally," *i.e.*, "the ability . . . to biologically reproduce with a partner of a different sex" ("Coital Condition"); and second, that DoD requires that ADSMs "show that they suffered a serious or severe illness or injury that 'has made it impossible to conceive naturally," and VA requires that veterans "establish that their infertility is service connected." *Id.* ¶¶ 7-8 ("SCD Condition").

Plaintiff alleges that these Eligibility Conditions prevent "its military and veteran members . . . who are in same-sex or unmarried couples, are single, and/or whose infertility is not determined by Defendant DoD or Defendant VA to be the result of military service" from obtaining IVF benefits in violation of the ACA, the due process clause of the Fifth Amendment (including the equal protection principles of that clause), and the APA. *Id.* ¶ 11; *id.* at 32. NOW-NYC seeks a declaratory judgment that the challenged Eligibility Conditions in the Appropriations Act and Defendants' IVF policies and regulations are unlawful and an injunction against Agency enforcement of the Eligibly Conditions in their policies and regulations. *Id.* at 32.

As described above, the Agencies have or will amend their respective IVF policies in ways that moot or significantly narrow Plaintiff's challenges to the Gametes, Marriage, and Coital Conditions. Plaintiff's claims pertaining to these conditions are therefore stayed until April 15. ECF Nos. 31, 50. Defendants now move to dismiss Plaintiff's claims for lack of jurisdiction, or, alternatively, to the extent they are based on the SCD Condition.

**STANDARD OF REVIEW**

On a Rule 12(b)(1) motion to dismiss, the party asserting subject-matter jurisdiction bears "the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). Though the Court must, at this stage, take well-pled allegations as true, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l*

*Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The court may refer to "documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citations omitted).

## ARGUMENT

### I. Plaintiff Lacks Standing

To establish standing, Plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A "plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). An organizational plaintiff may establish standing in two ways. It may sue on "its own behalf," *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998), or it may "assert the rights of its members under the doctrine of associational standing." *Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977)).

#### A. Plaintiff Lacks Organizational Standing

An organization has standing where it can establish "that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). That showing requires "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable." *Id.* at 172–73 (citation omitted). "[T]he challenged action" must do more than "merely harm [the organization's] 'abstract social interests.'" *Id.* at 173

(quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Rather, it must "perceptibly impair[]" the organization's activities by imposing "involuntary and material impacts on core activities by which the organizational mission has historically been carried out," *id.* at 173, 175 (emphasis omitted); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976) ("organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III").

The Amended Complaint does not establish the requisite injury in fact. NOW-NYC alleges only that the Eligibility Conditions "undermine[] NOW-NYC's mission," Am. Compl. ¶ 64, and its "fight for reproductive justice and non-discrimination," *id.* ¶ 63. These alleged harms are no "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379; *see Conn. Parents*, 8 F.4th at 173; *Simon*, 426 U.S. at 40. NOW-NYC has not alleged any "perceptible opportunity cost." *Conn. Parents*, 8 F.4th at 173 (citation omitted). For example, it does not allege that the Eligibility Conditions imposed on it any involuntary costs "in time, money, or danger," such as an "increased demand for [its] services" or the forced expenditure of funds "reasonably necessary to continue an established core activity of the organization." *Id.* at 173–74 (collecting cases). NOW-NYC thus lacks standing to sue on its own behalf.

### B. Plaintiff Lacks Associational Standing to Challenge DoD's SCD Condition Because It Has Not Identified Any Member Whose Rights It Seeks to Vindicate

Plaintiff also cannot rely on associational standing to challenge DoD's SCD Condition. "To bring suit on behalf of its membership, the organization must demonstrate," among other requirements, that "its members would otherwise have standing to sue in their own right." *Irish Lesbian & Gay Org.*, 143 F.3d at 649 (citation omitted). "[A]n association cannot just describe the characteristics of specific members with cognizable injuries; it must identify at least one by name." *Do No Harm v. Pfizer Inc.*, No. 23-15, 2024 WL 949506, at *7 (2d Cir. Mar. 6, 2024) (citing

*Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (holding that "requirement of naming the affected members has never been dispensed with" unless "*all* the members of the organization are affected by the challenged activity")); *see also Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 320–21 (S.D.N.Y. 2020) (holding that plaintiff was "required to identify at least one affected member by name").

Plaintiff cannot establish associational standing to challenge DoD's Eligibility Conditions because it has not identified, by name, any NOW-NYC member who is an ADSM that has been harmed by those conditions. Plaintiff asserts that naming the three unidentified ADSMs referenced in the Amended Complaint, *see* Am. Compl. ¶¶ 66-68, will subject them to "potential retaliation and the collateral consequences [thereof]," and "risk potential punitive action by their chains of command" under Articles 88, 133, and 134 of the Uniform Code of Military Judgment ("UCMJ"), 10 U.S.C. §§ 888, 933, 934. Am. Compl. ¶¶ 76-79. As a threshold matter, naming an affected member is a *requirement* for associational standing, and Plaintiff cites no authority indicating that an organization may be relieved of an Article III requirement for equitable reasons. Regardless, Plaintiff offers no evidence to show that its members, if named, would face any risk of retaliation, and courts have routinely held that such "vague, unsubstantiated fears of retaliatory actions by higher-ups do not permit a plaintiff to proceed under a pseudonym." *Qualls v. Rumsfeld*, 228 F.R.D. 8, 12 (D.D.C. 2005).[4] Nor has Plaintiff demonstrated how the unnamed ADSMs face a

---

[4] Other than engaging in pure speculation, Plaintiff has not demonstrated how the unnamed ADSMs could be subject to punishment under Article 88 of the UCMJ for being identified in the Amended Complaint. *See United States v. Brown*, 45 M.J. 389, 397 (C.A.A.F. 1996) (observing that "[o]ne of the rare instances of prosecution under this clause involved an individual who used contemptuous expressions about President Lincoln"). Similarly, being identified in a lawsuit as an organizational member does not rise to the level of prosecutable conduct under Articles 133 and 134 of the UCMJ. Examples of conduct that is potentially punishable under Article 133 include "knowingly making a false official statement," "dishonorable failure to pay a debt," "cheating on an exam," and "being drunk and disorderly in a public space." *See Manual for Courts-Martial*, *United* States (2024 ed.), pt. IV, ¶ 90.c (2024 ed.). Conduct considered punishable under Article 134 includes engaging in the abuse, neglect, or abandonment of an animal, *id.* ¶¶ 92a–e; possessing, receiving or viewing child pornography, *id.* ¶¶ 93a–e; and sexual harassment, *id.* ¶¶ 107a.a–e.

greater risk of harm than numerous other ADSMs who have routinely brought claims against the federal government in their own names. *See, e.g.*, *Matthew v. United States*, 311 Fed. App'x 409 (2d Cir. 2009); *Bon v. United States*, 802 F.2d 1092 (9th Cir. 1986); *Church v. Biden*, 573 F. Supp. 3d 118 (D.D.C. 2021); *Cubias v. United States*, No. 5:19-CV-46-FL, 2019 WL 4621981 (E.D.N.C. Sept. 23, 2019). Plaintiff's assertion that naming the ADSMs would "require them to share private medical and family structure information with the public," Am. Compl. ¶ 76, is also unavailing, because they have not demonstrated how their concerns about disclosure are any different than the "medical and family structure information" already disclosed by the NOW-NYC veteran members identified in the Amended Complaint. *Id.* ¶¶ 70–76. Accordingly, Plaintiff has not established standing to bring suit against DoD on behalf of any of its members.

## II. The VJRA Divests the Court of Jurisdiction Over Plaintiff's Claims Against VA

The Veterans Judicial Review Act ("VJRA") precludes district court jurisdiction over Plaintiff's claims against VA. The VJRA states that VA "shall decide all questions of law and fact necessary to a decision . . . that affects the provision of benefits . . . to veterans," and that those decisions are "final and conclusive and may not be reviewed by any other official or by any court," except as otherwise provided. 38 U.S.C. § 511(a). Under the VJRA, when VA "makes a decision on the award of benefits," a veteran can seek further review of that decision only through the procedure set forth in the VJRA. *Larrabee by Jones v. Derwinski*, 968 F.2d 1497, 1501 (2d Cir. 1992) (citing 38 U.S.C. § 7105). Specifically, a veteran may appeal an adverse benefits determination to the Board of Veterans' Appeals ("Board"), and then to the Court of Veterans Appeals, "an Article I court established by the VJRA with 'exclusive jurisdiction' to review the decisions of the Board." *Id.* (citing 38 U.S.C. § 7252(a)). "Decisions of the Court of Veterans Appeals may then be appealed, but only to the Federal Circuit." *Id.* (citing 38 U.S.C. § 7292).

Importantly, the VJRA states that, on appeal, the Federal Circuit "shall have exclusive jurisdiction to review and decide any challenge to the validity of any statute or regulation or any interpretation thereof . . . and to interpret constitutional and statutory provisions, to the extent presented and necessary to a decision." 38 U.S.C. § 7292(c). This review scheme "precludes federal courts from hearing claims—even if draped in constitutional terms—seeking a particular type or level of medical care." *Larrabee*, 968 F.2d at 1500; *see also id.* at 1501 (VJRA's "provisions amply evince Congress's intent to include all issues, even constitutional ones, necessary to a decision which affects benefits in [the VJRA's] exclusive appellate review scheme.").

Plaintiff's claims against VA "seek[] a particular type . . . of medical care"—IVF—and so the VJRA "precludes [the Court] from hearing [those] claims." *Id.* at 1500. Directive 1334 states as much: "Denials of a Veteran's or a spouse's eligibility for IVF counseling or services under law and this policy should follow normal [VA] appeals procedures." Am. Compl. Ex. C at 11, § 5(i). Any effort by Plaintiff to rely on Second Circuit case law noting that the VJRA "does not" necessarily "deprive [district courts] of jurisdiction to hear facial challenges of legislation affecting veterans' benefits," *Disabled Am. Veterans v. U.S. Dep't of Veterans Affs.*, 962 F.2d 136, 140 (2d Cir. 1992), would be unavailing. The Second Circuit has not held that *any* facial constitutional challenge may be brought in district court. Rather, in *Disabled American Veterans*, the court found that "the district court had jurisdiction to consider" a facial challenge where the plaintiffs "neither ma[de] a claim for benefits nor challenge[d] the denial of such a claim." *Id.* at 141. And two years later, the Second Circuit cautioned that "courts do not acquire jurisdiction to hear challenges to benefits determinations merely because those challenges are cloaked in constitutional terms." *Sugrue v. Derwinski*, 26 F.3d 8, 11 (2d Cir. 1994). Plaintiff here "challenge[s] the denial of such a claim." *Disabled Am. Veterans*, 962 F.2d at 141; *see, e.g.*, Am. Compl. ¶ 13 ("NOW-NYC's

members include . . . veterans *denied IVF coverage by Defendants* because of each of the [Eligibility Conditions] (emphasis added)); *id.* ¶ 69 (alleging veteran "was denied IVF services because she" did not satisfy the Marriage Condition); *id.* ¶ 70 (alleging veteran seeking IVF was "denied under the [Gametes Condition]"). As such, Plaintiff cannot evade the exclusive review scheme Congress established in the VJRA, even if it casts such arguments as a facial challenge.[5]

Nor would it matter that some NOW-NYC members who wish to use IVF benefits have yet to request them from VA, and thus lack a denial to appeal. If those members' claims relate to an expected denial of benefits, they must file their benefit claims and then appeal a decision on those claims. *See Heckler v. Ringer*, 466 U.S. 602, 621–22 (1984) (plaintiff could not avoid statutory review scheme where he had not filed claim but sought to "establish a right to future payments should he ultimately decide to proceed with" medical care; he had to file a "concrete claim for" benefits and, if denied, appeal). Plaintiff's members cannot sidestep the review scheme by abstaining from seeking IVF benefits and filing a pre-emptive "facial" challenge. *See id.* at 621 (parties cannot "bypass" review scheme "by simply bringing declaratory judgment actions in federal court before they" file benefits claims); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 338 (S.D.N.Y. 2007) (plaintiff "cannot attempt an end-run around" statutory review scheme "by preemptively" raising a legal challenge "before [agency] issues a decision"). The Court thus lacks jurisdiction over claims against VA.

## III. Plaintiff Fails to State a Substantive Due Process Claim Against the Agencies' SCD Conditions

Plaintiff claims that by failing to provide IVF benefits to *all* military service members and veterans, regardless of whether they have suffered a service-connected disability, DoD and VA

---

[5] Plaintiff does not raise an APA challenge to VA's IVF policy under 5 U.S.C. § 706(2)(A). A challenge to agency rulemaking would also be subject to channeling under a different provision of the VJRA. *See* 38 U.S.C. § 502.

have "implicat[ed]" their fundamental "right to procreate." Am. Compl. ¶¶ 115-16. Plaintiff appears to argue that the government has an affirmative, constitutional duty to provide benefits that enable service members and veterans to bear children.[6] This argument, however, flouts clear Supreme Court precedent. "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions"—including the decision to conceive children—"it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Harris v. McRae*, 448 U.S. 297, 317–18 (1980). "It cannot be that because government may not prohibit" people from procreating that "government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain" services necessary to conceive children. *Id.* at 318. Accordingly, the Agencies' SCD Conditions do not implicate a fundamental right to procreate simply by denying IVF benefits to those who lack a service-connected disability.

Because the SCD Conditions do not "jeopardize[] [the] exercise of a fundamental right," those requirements need only "rationally further a legitimate state interest"; *i.e.*, "there [need only be] a plausible policy reason for" the requirements. *Nordlinger v. Hahn*, 505 U.S. 1, 10–11 (1992). A policy satisfies rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). A governmental policy "bear[s] a strong presumption of validity . . . and those attacking [its] rationality . . . have the burden to negative every conceivable basis which might support it." *Id.* at 314–15 (citations omitted). Further, rational basis review is especially deferential "where the legislature must . . . engage in a process of line-drawing" to identify "governmental

[6] Plaintiff also states, as part of its substantive due process claim, that Plaintiff's members "have been denied equal protection on the basis of their exercise of their fundamental right to procreate." Am. Compl. ¶ 117. It is unclear how this theory is distinct from Plaintiff's equal protection claim, which is addressed *infra* § IV.

beneficiaries" because that task "inevitably requires that some persons," even those who might "have an almost equally strong claim to favored treatment[,] be placed on different sides of the line." *Id.* at 315–16. That "the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.* at 316. Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313–14.

The SCD Conditions clear this low hurdle. After providing for primary health services to qualifying service members and veterans, Congress decided to provide certain extended benefits—including those that may be used for IVF services—only when they are needed by those with injuries or illnesses related to their service. An obvious, "reasonably conceivable" justification for targeting benefits in that way is that Congress concluded it was important to compensate their service by remedying their service-related injury or illness. This justification is especially sound in the context of expensive IVF benefits.[7] *See Schweiker v. Wilson*, 450 U.S. 221, 237 (1981) ("congressional desire to economize in the disbursement of federal funds" and thus "limit distribution of" certain benefits to particular groups is not "an irrational basis for withholding" those benefits from others). "Awarding this type of benefit[] inevitably involves the kind of line-drawing that will leave some . . . outside the favored circle," and so Congress must "have discretion in deciding how to [allocate] necessarily limited resources" among potential beneficiaries. *Id.* at 238. The SCD Conditions are thus rational.

[7] *See*, *e.g.*, 159 Cong. Rec. S3611 (May 20, 2013) (statement of Sen. Gillibrand) ("medical advancements, such as [IVF], have provided a solution for some would be parents," but "[i]t costs more than $12,000 for a couple to undergo one cycle of infertility treatment"); Reproductive Biology and Endocrinology Journal, National Institute of Health, National Library of Medicine (Aug. 4, 2022), https://perma.cc/DC8N-EVPX ("[The American Society for Reproductive Medicine] states that the average cost of an IVF cycle in the US is $12,400. However, other studies estimate the cost per cycle at approximately $20,000-$25,000."). The Court can take judicial notice of these sources. *See Rynasko v. N.Y. Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) ("When considering a motion made pursuant to Rule 12(b)(6)" a court "may take judicial notice of documents from official government websites" (citations omitted)).

In attempting to show that the SCD Conditions are irrational, Plaintiff first alleges that the Agencies offer all other health care benefits for service members and veterans regardless of whether they suffered a service-connected disability. Am. Compl. ¶¶ 9, 55, 57-60. As an initial matter, this is incorrect. All extended benefits provided by DoD under 10 U.S.C. § 1074(c)(4) and § 1079(d), (e) contain a service-connected disability requirement, including customized hand crank bikes, custodial care, and respite care, *see* TRICARE Manual: Supplemental Health Care Program, Ch. 17, §§ 2.4.2, 2.4.2.8, 2.4.2.9.[8] Similarly, certain other benefits provided by VA contain a service-connected disability requirement. *See, e.g.*, 38 U.S.C. § 1712(a)(1)(A)-(C) (authorizing VA reimbursement of certain dental care where service-connected); *id.* § 1728(a)(1), (2) (authorizing VA reimbursement of certain emergency treatment related to veteran's service-connected disability).

Even crediting Plaintiff's argument, it remains "reasonably conceivable" that the difference in coverage for various services is justified by material differences in the nature of those services. For example, Plaintiff alleges that "veterans can access oocyte cryopreservation (or egg freezing), intrauterine insemination ('IUI,' or artificial insemination), and erectile dysfunction medication through VA without a specific service-connected infertility diagnosis." Am. Compl. ¶ 9. Such benefits differ from IVF in obvious respects, including cost and complexity. And the allegedly broad coverage of other ART benefits underscores why the IVF policies satisfy rationality; against the backdrop of benefits such as "hormone evaluations and sperm function tests, hormone therapy, surgical corrections of structural pathologies, fertility medications, oocyte cryopreservation, and IUI," *id.* ¶ 58, it is rational to restrict one particularly expensive and complex procedure.

---

[8] Health.mil, TRICARE Operations Manual, https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-05-24/ChangeOnly/TO15/c17s3.html (Apr. 1, 2015).

Plaintiff also cites to TRICARE's coverage of "emergency, specialty, and routine care, including health care unrelated to an injury sustained on active duty," where "medically necessary." *Id.* ¶ 55. In doing so, Plaintiff ignores that such benefits may be provided pursuant to separate statutes carrying different restrictions. But even if they were not, it is nonetheless rational for DoD to make certain types of care more accessible than others. Offering emergency, specialty, and routine care benefits without any service-connected disability requirement serves the military's goal of ensuring service members remain, or become, physically fit for service. Plaintiff does not claim that IVF access implicates an ADSM's military readiness.

Simply put, Plaintiff does not establish that either DoD or VA fully covers, for all service members and veterans, a treatment that is identical (or even substantially similar) to IVF in all relevant respects. That is critical since, under the rational basis test, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Heller v. Doe by Doe*, 509 U.S. 312, 320–21 (1993) (citation omitted).

Plaintiff next notes that certain health insurance policies for federal employees provide IVF benefits and that the failure to do so for all service members and veterans is therefore irrational. *See* Am. Compl. ¶¶ 56, 121. But Plaintiff does not claim that all of those policies provide the same comprehensive IVF benefits that Plaintiff wants DoD and VA to provide. Rather, Plaintiff alleges that "beginning in 2024, all Federal Employee Health Benefit ('FEHB') plans will be required to cover IVF *medications*," and that "*certain* plans, including in New York, will cover all IVF services." *Id.* ¶ 56 (emphases added); *see also* N.Y. Ins. L. §§ 3221(k)(6)(C)(vii), 4303(s)(3)(G) (mandating "large group" insurance policies cover IVF in New York). Regardless, Plaintiff is comparing drastically different health benefit systems, which understandably provide different benefits. FEHB policies are provided through private companies and coverage is based on

extensive negotiations between those companies and the Office of Personnel and Management ("OPM"). *See*, *e.g.*, 5 C.F.R. § 890.203(a)(2) (private insurance companies may submit "benefit and rate proposals to OPM . . . in order to be considered for participation in" the FEHB and "OPM may make counter-proposals at any time"). By contrast, the TRICARE program and VHA are federally administered health care programs, wherein coverage is not provided through private insurers and services may be delivered directly at military or VA facilities. *See, e.g.*, 32 C.F.R. §§ 199.17(a), 199.1(d); 38 C.F.R. §§ 17.36, 17.38; Benefits.gov, *Basic Medical Benefits Package for Veterans*, https://perma.cc/86CW-NJ3Q; VA, *Eligibility for community care outside VA*, https://perma.cc/ZTN8-YAHN. Further, health care through DoD and VA is heavily subsidized, while federal employees generally pay a more significant portion of their health insurance premiums. *See*, *e.g.*, 5 C.F.R. § 890.502(a); 10 U.S.C. §§ 1073d, 1075a(a)(1); 38 U.S.C. § 1710. It is, at minimum, "reasonably conceivable" that the differences in coverage between federal employee health insurance policies and military health programs are properly attributable to the differences in how each is authorized, formed, funded, and administered. *Beach Commc'ns, Inc.*, 508 U.S. at 313–14. Plaintiff thus fails to overcome the "strong presumption of constitutionality" that applies "to legislation conferring monetary benefits." *Schweiker*, 450 U.S. at 238 (citation omitted).

## IV. Plaintiff Fails to State an Equal Protection Claim Against the SCD Conditions

Plaintiff claims that the SCD Conditions disproportionately impact, and thus deny equal protection to, "women, transgender people, and same-sex couples" (the "Protected Classes"). Am. Compl. ¶ 97. For an equal protection claim, a policy that disproportionately impacts a protected class may be subject to strict scrutiny only if there was a "[d]iscriminatory purpose;" *i.e.*, "the decisionmaker" must have adopted the policy "because of, not merely in spite of, its adverse effects

upon" the protected class. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 & n.24 (1979). Plaintiff's disproportionate impact claim fails for several reasons.

First, Plaintiff cannot establish the requisite "disproportionate impact." A plaintiff must establish "a substantial disparate impact on" the protected class before the equal protection "analysis [may] continue." *Califano v. Boles*, 443 U.S. 282, 294 (1979). An "incidental and . . . speculative [disparate] impact" is insufficient. *Id.* at 296. Here, Plaintiff generally alleges that "more" members of the Protected Classes "need IVF to start families," Am. Compl. ¶ 97, but the Amended Complaint lacks any factual support for this assertion. Men experience fertility issues—such as genitourinary injuries—that render IVF appropriate. *See*, *e.g.*, *id*. Ex. C at 6, § 2(n). Indeed, the Amended Complaint itself alleges that "[i]nfertility affects service members and veterans of all gender identities," Am. Compl. ¶ 20, and relies on a study finding that "compared with men, women Veterans had similar odds of lifetime history of infertility," Jodie Katon et al., *Self-Reported Infertility Among Male and Female Veterans Serving During Operation Enduring Freedom/Operation Iraqi Freedom*, 23 J. Women's Health 175, 175 (2013) (cited in Am. Compl. ¶ 20, n.4.). Further, while same-sex couples who want biological children may have to rely on ART, that does not mean they require IVF in particular. Other forms of ART exist, such as IUI. *See* Am. Compl. ¶¶ 9, 58, 60, 125. And although certain same-sex couples will ultimately need IVF due to infertility, the same will be true of certain opposite-sex couples. Plaintiff thus fails to show that the SCD Conditions have a substantial disparate impact on the Protected Classes.

Second, even if Plaintiff can establish the requisite disproportionate impact, it cannot show that the Agencies adopted the SCD Conditions for the *purpose* of discriminating against the Protected Classes. For one, Plaintiff does not deny that people in the Protected Classes are capable of meeting the SCD Conditions, and that many people outside of the Protected Classes may fail to

meet those conditions, undermining any inference that the SCD Conditions were meant to disfavor the Protected Classes. *Cf. Feeney*, 442 U.S. at 275 (refusing to infer a discriminatory intent for a veterans preference that overwhelmingly benefited men because women could also "benefit from the preference" and "significant numbers of nonveterans" were men). Further, an inference of "invidious discrimination" is especially not "plausible" here because there is an "obvious alternative explanation" for the SCD Conditions: Congress and the Agencies concluded it was sensible to focus limited benefits on those with service-related injuries. *Iqbal*, 556 U.S. at 682 (citation omitted). To satisfy the intent requirement, Plaintiff merely alleges that the Agencies were "aware" of the alleged disproportionate impact on the Protected Classes. Am. Compl. ¶ 97. The Supreme Court, however, has made clear that "[d]iscriminatory purpose . . . implies more than . . . awareness of consequences." *Feeney*, 442 U.S. at 279 (citation omitted). Plaintiff must show that the Agencies were trying to harm the Protected Classes, and its allegations support no such showing. Accordingly, the SCD Conditions need only satisfy the rational basis test, and as explained above, they do. *See United States v. Moore*, 54 F.3d 92, 96 (2d Cir. 1995) ("If the plaintiffs do not allege actual discriminatory intent, the deferential 'rational basis' standard is used."); *see supra* at 17-21.

**V. Plaintiff Fails to State a Section 1557 Claim Against the SCD Conditions**

Plaintiff claims that the SCD Conditions disproportionately impact the Protected Classes and thus discriminate based on sex in violation of the ACA's Section 1557. *See* Am. Compl. ¶¶ 89-90. This claim fails because a private party cannot establish a Section 1557 sex-discrimination claim based on a disproportionate impact theory. "Section 1557 . . . prohibits discrimination and the denial of benefits on the basis of" certain grounds including "sex." *Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 520 (S.D.N.Y. 2018) (citing 42 U.S.C. § 18116), *recons. denied sub nom. Weinreb v. Xerox Bus. Servs.*, No. 16-CV-6823 (JGK), 2020

WL 4288376 (S.D.N.Y. July 27, 2020). Section 1557 "incorporates [the] Title IX sex discrimination" private right of action "and its accompanying pleading standards." *Id.* at 521. "In effect, what this means is that" a private "plaintiff suing for sex discrimination under the ACA is only able to put forward an intentional discrimination claim, not a disparate impact claim, because Title IX . . . does not provide for disparate impact theories." *Id.*; *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) ("Title IX has been construed to prohibit . . . intentional exclusion . . . on the basis of sex."); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 n.6 (S.D.N.Y. 2015) ("numerous courts have dismissed private actions to enforce Title IX itself or regulations implementing Title IX when the allegations were based on a disparate impact theory").

But even if Section 1557 allowed for disproportionate impact sex discrimination claims, Plaintiff's legal theory would still fail. First, as noted above, Plaintiff has failed to adequately allege that the SCD Conditions do indeed disproportionately impact women and LGBTQ+ individuals. *See supra* at 21-22. Additionally, an alleged disparate impact likely would not be actionable under Section 1557 if the relevant policy serves a legitimate interest. *Cf. Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) (a "disparate impact" claim fails if the relevant policy serves a "legitimate interest," which can include "[f]actors such as . . . cost"). As explained, the SCD Conditions serve a legitimate interest in focusing limited resources to provide an expensive benefit to those with service-connected injuries. *See supra* at 17-18. Furthermore, to the extent Plaintiff is trying to assert a section 1557 disparate impact claim analogous to its equal protection claim—*i.e.*, that there is allegedly a disparate impact with an intent to discriminate—Plaintiff has failed to adequately plead any discriminatory intent. *See supra* at 22-23. The Court should dismiss Plaintiff's Section 1557 claim insofar as it applies to the SCD Conditions.

**VI. Plaintiff Fails to State an APA Arbitrary and Capricious Claim Against DoD's SCD Condition**

Finally, Plaintiff claims that DoD's SCD Condition is arbitrary and capricious, and thus unlawful under the APA, because DoD allegedly offered no "adequate justification" for it. *See* Am. Compl. ¶ 133; *see also id.* ¶¶ 137-39 (alleging that DoD's SCD Condition is irrational). "The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "The test" is "primarily one of rationality." *Cnty. of Rockland v. U.S. Nuclear Regul. Comm'n*, 709 F.2d 766, 776 (2d Cir. 1983). As explained above, the SCD Condition is rational. *See supra* at 17-21.

Moreover, the SCD Condition is especially reasonable here because it was *required* by the statute DoD relied upon in extending its IVF benefits. Where an agency claims that its decision is required by statute, a court merely asks whether the "agency's interpretation of [the] statutory provision" at issue "is reasonable." *Catskill Mountains Chapter of Trout Unlimited v. EPA*, 846 F.3d 492, 521 (2d Cir. 2017). *See also Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (The "standard 'arbitrary [and] capricious' review" is a "more apt analytic framework" when dealing with an agency's "policy" judgment rather than an agency's "interpretation of . . . statutory language."). DoD's SCD Condition is required by the statute under which it provides IVF benefits: Section 1074(c)(4). *See* Amended 2012 DoD Memo at 2, § III.B; 2012 DoD Memo at 1, § III.B (stating same). Section 1074(c)(4)(A) authorizes extended benefits for "members of the uniformed services who incur a serious injury or illness on active duty" and to the extent "comparable to [coverage] provided . . . under subsections (d) and (e) of section 1079," namely, where such benefits "assist in the reduction of the disabling effects of [the ADSM's] qualifying condition," 10 U.S.C. § 1079(d)(1). DoD reasonably interpreted this language in extending IVF benefits to those

who require ART to procreate due to a Category II or III illness or injury, and the Amended Complaint does not appear to suggest (much less explain why) DoD's reading of that statute is incorrect. The APA claim should therefore be dismissed insofar as it applies to DoD's SCD Condition.[9]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the Motion to Dismiss and dismiss this case for lack of jurisdiction or, in the alternative, dismiss Plaintiff's challenge to the SCD Condition for failure to state a claim.

[9] DoD disputes Plaintiff's suggestion that it could administer its IVF benefits under some separate statutory authority. DoD's coverage of care provided in private facilities is generally limited to services that are "medically or psychologically necessary to prevent, diagnose, or *treat* a mental or physical illness, injury, or bodily malfunction." 10 U.S.C. § 1079(a)(12) (emphasis added); *see id*. § 1074(c)(2)(A). DoD has long understood this restriction as preventing it from covering ART services outside the authorization in Section 1074(c)(4). *See, e.g.*, 32 C.F.R. § 199.4(e)(3)(i)(B)(3), (g)(34) (excluding IVF and other "noncoital reproductive procedures" from DoD basic benefits); 51 Fed. Reg. 24,008, 24,032(e)(3)(i)(B)(3) (July 1, 1986) (excluding coverage of "[a]rtificial insemination, including any costs related to donors or semen banks"); 42 Fed. Reg. 17,972, 17,996(e)(3)(i)(b)(3) (April 4, 1977) (same); *see also* 2010 DoD Memo at 1 (recognizing that IVF benefits are not "covered under the TRICARE basic program"). However, because Plaintiff's legal theories fail for many other reasons, the Court need not resolve this issue at this stage.

Dated: March 15, 2024

Respectfully submitted,

BRYAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Branch Director

By: */s/ Laura B. Bakst*
LAURA B. BAKST
KUNTAL CHOLERA
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-3183
E-mail: laura.b.bakst@usdoj.gov
kuntal.cholera@usdoj.gov

DAMIAN WILLIAMS
United States Attorney for the Southern District of New York

By: */s/ Tomoko Onozawa*
TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Phone: (212) 637-2721
E-mail: tomoko.onozawa@usdoj.gov